Nancy **HOLBROOK,** Respondent,

v.

**STATE OF MINNESOTA GAMBLING CONTROL BOARD,** Appellant,

**American Legion Richard Dingle Post 98,** Respondent.

No. C9–94–2386.

Court of Appeals of Minnesota.

June 6, 1995.

Judith L. Oakes, 780 Galtier Plaza, St. Paul, for respondent Holbrook.

Hubert H. Humphrey, III, Atty. Gen., E. Joseph Newton, Asst. Atty. Gen., St. Paul, for appellant State of Minn. Gambling Control Bd.

Mark W. Gehan, Jr., Sarah J. Batzli, St. Paul, for respondent American Legion Richard Dingle Post 98.

Considered and decided by KLAPHAKE, P.J., and RANDALL and MANSUR,* JJ.

---

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

## OPINION

KLAPHAKE, Judge.

Appellant Minnesota Gambling Control Board (the Board) appeals the district court's judgment allowing respondent American Legion Richard Dingle Post 98 (the Legion) to pay the settlement of a sexual harassment lawsuit out of its gambling profits. The district court concluded that the settlement was an "allowable expense" under Minn.Stat. § 349.12, subd. 3a (1994). We affirm the judgment for respondents Nancy Holbrook and the Legion.

## FACTS

In July 1988, Holbrook began working as a pull-tab seller at the Legion. In November 1993, she commenced an action against the Legion alleging that fellow employee James Lind, Treasurer and Chairman of Gambling, had sexually harassed her on the job and throughout the course of her employment. She alleged that shortly after she began working at the Legion, she complained to the Legion's Gambling Manager of the harassment, but no action was taken to correct the problem. In April 1993, she was terminated. In the lawsuit, Holbrook claimed pain and suffering, and lost wages, tips, and other compensation.

The Legion was in the business of selling and serving food and beverages, as well as lawful gambling. Holbrook and Lind were involved solely in the gambling operation and were paid out of the gambling funds. In July 1994, the parties stipulated to a settlement of $60,000 to be paid out of the Legion's gambling profits for all of Holbrook's claims. The parties agreed that "it is necessary to resolve the question whether the settlement payment would be an allowable expense related to lawful gambling" and that resolution of this legal issue required joinder of the Board. The stipulation also stated that the Legion had insufficient funds from other sources to pay the settlement.

Over the Board's objection, the district court ordered joinder of the Board as a

necessary party. After hearing arguments on the issues of joinder and use of the gambling profits to pay the settlement, the district court concluded that the Legion could pay the settlement out of its gross profits from gambling. Judgment was entered for Holbrook pursuant to the settlement, and the settlement funds were escrowed. The Board appeals.

## ISSUES

I. Does the new law defining "allowable expense," which was enacted after the parties' stipulation for settlement but before the district court's order for judgment, apply?

II. Is the Board's opinion that payment of a sexual harassment lawsuit settlement is not an "allowable expense" entitled to great weight or deference?

III. Is settlement of this sexual harassment lawsuit an "allowable expense" under Minn.Stat. § 349.12, subd. 3a (1994)?

## ANALYSIS

### I.

■ The statute defining "allowable expense" changed after the parties' stipulation for settlement and before the district court issued its order for judgment. *See* 1994 Minn.Laws ch. 633, art. 5, § 2. In determining whether the new law applies to this case, we look at whether the party seeking application of the prior law had an "accrued" or "vested" right that was adversely affected by the new legislation.

"[A] right is not 'vested' unless it is something more than a mere expectation, based on an anticipated continuance of present laws. It must be some right or interest in property that has become fixed or established, and is not open to doubt or controversy."

*Olsen v. Special Sch. Dist. No. 1,* 427 N.W.2d 707, 711 (Minn.App.1988) (quoting *Schwarzkopf v. Sac County Bd. of Supervisors,* 341 N.W.2d 1, 8 (Iowa 1983)).

1. Because the Board is a litigant in these proceedings, there is no Board decision being reviewed.

■ Under the circumstances of this case, Holbrook and the Legion did not have a vested right in the settlement on August 1, 1994, when the new law took effect. *See* Minn.Stat. § 645.02 (1994) (where no effective date specified, law is effective August 1 next following its final enactment). The parties' settlement was expressly contingent on a court rendering a legal determination: the settlement was "subject to the resolution of a legal question, permitting payment from a specified source." The Legion was not bound to pay unless that legal determination was made in its favor. In the stipulation, the parties acknowledged that the legal issue was disputed by the Board. They also agreed to convene for a hearing on August 11, 1994, after the new law became effective. Thus, the district court's decision was not only made after the effective date, but also was based on a hearing held after the effective date. There was no vested right when the parties agreed to require legal resolution of the issue and no resolution, not even a preliminary resolution, existed as of the effective date of the new law. Since Holbrook and the Legion had nothing more than a "mere expectation" in the expense being characterized as an allowable expense, the new law applies.

### II.

■ "[O]n matters of statutory interpretation, this court is not bound by the determination of an administrative agency." *Arvig Tel. Co. v. Northwestern Bell Tel. Co.,* 270 N.W.2d 111, 114 (Minn.1978). An agency's construction of a statute may be entitled to deference, however, when (1) the statutory language is so technical in nature that only a specialized agency has the requisite experience and expertise to understand it; (2) the agency's interpretation is one of long-standing application; or (3) the statutory language is ambiguous. *Resident v. Noot,* 305 N.W.2d 311, 312 (Minn.1981). While the parties agree that resolution of this case requires statutory interpretation, they disagree on whether the Board's position[1] is entitled to deference.

■ The new law defines allowable expenses as

> the percentage of the total cost incurred by the organization in the purchase of any good, service, or other item which corresponds to the proportion of the total actual use of the good, service, or other item that is directly related to conduct of lawful gambling.

Minn.Stat. § 349.12, subd. 3a (1994). This definition consists of words of common usage, not terms technical in nature. The agency's expertise, therefore is unnecessary for interpretation of the statute. There is also no interpretation of longstanding application, because the statute is newly enacted.[2] Finally, the language is expressed in clear and common terms. Therefore, the Board's position is not entitled to deference by this court.

### III.

Minnesota appellate courts have not considered what is or is not an "allowable expense" under Minn.Stat. § 349.12, subd. 3a. Because application of the definition of "allowable expense" requires consideration of the state regulatory scheme for lawful gambling, we begin with a discussion of the gaming laws.

■ Lawful gambling is a heavily regulated industry, and Minnesota has an "interest in tight administrative controls over gambling generally." *Brainerd Area Civic Ctr. v. Commissioner of Revenue*, 499 N.W.2d 468, 471 (Minn.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 440, 126 L.Ed.2d 373 (1993).

Not only does the state regulate the way gambling is conducted, but also the accounting and use of the gross profits. *See* Minn. Stat. § 349.15 (1994); Minn.R. 7861–65 (1993).

The legislature has limited the use of gross profits to "lawful purposes or allowable expenses." Minn.Stat. § 349.15, subd. 1.[3] "Lawful purpose" means those charitable contributions which are specifically itemized in the statute. *Id.* § 349.12, subd. 25. "Allowable expense," in contrast, has only a general definition. *See id.* § 349.12, subd. 3a. By expressly capping "allowable expenses" at 50 percent of gross profits, the legislature effectively requires at least 50 percent of the profits from lawful gambling to be expended for charitable contributions. *See id.* § 349.15, subd. 1. By so doing, it also accomplishes its express purpose of providing for "the use of net profits only for lawful purposes." *Id.* § 349.11. The Board is responsible for monitoring compliance with the law governing gross profits from lawful gambling. *Id.* § 349.151, subd. 4.

The legislature's treatment of "allowable expenses" has evolved over the years. Until 1991, there was no statutory definition of allowable expenses: the legislature required that the Board specify allowable expenses by rule.[4] *See id.* § 349.15 (1990). In 1991, the legislature adopted the definition, "an expense directly related to the conduct of lawful gambling," and repealed the Board's rulemaking authority on the issue. 1991 Minn. Laws ch. 336, art. 2, §§ 10, 13. In 1994, the legislature changed the definition so that allowable expenses included the proportion of

---

**2.** The Board attached its prior rule and some administrative and legislative history to its reply brief. The Legion and Holbrook moved to have these stricken from the record. We decline to do so as they are relevant administrative and legislative history. *See State v. Simonsen*, 252 Minn. 315, 327–28, 89 N.W.2d 910, 918 (1958).

**3.** The use of gambling profits is limited as follows:

> Gross profits from lawful gambling may be expended only for lawful purposes or allowable expenses as authorized * * * at a monthly meeting of the organization's membership. Provided that * * * no more than 50 percent of the gross profit from other forms of lawful gambling, may be expended for allowable expenses related to lawful gambling.

Minn.Stat. § 349.15, subd. 1 (1994).

**4.** Until its repeal in 1991, the Board's rule included the following as "allowable expenses":

> [P]rizes; gambling supplies and equipment; rent; utilities used during gambling occasions; compensation paid to members for conducting gambling on a compensation schedule devised by the organization for its employees for the conduct of lawful gambling and file that report with the board; maintenance of devices used in lawful gambling; accounting services; license renewal; bond for gambling manager; insurance on gambling activities; investigation fee; and one-third of the amount of increase in the annual premium of the liability insurance.

Minn.R. 7860.0160, subpt. 1 (1991) (repealed 16 Minn.Reg. 909, 950 (Oct. 14, 1991) and 16 Minn. Reg. 2116 (Mar. 23, 1992)).

the total cost for "the purchase of any good, service, or other item * * * that is directly related to conduct of lawful gambling." 1994 Minn.Law ch. 633, art. 5, § 2.

By substituting the Board's rulemaking authority on the issue of "allowable expenses" with a single statutory definition, the legislature expressed a preference for a simple definition over the itemizing previously conducted by the Board. The 1994 amendment to the definition simply added to the statutory definition that the expense be for the "purchase of any good, service, or other item." It retained the requirement that the item be allowable only in the proportion of its actual use directly relating to the conduct of lawful gambling.

 We think that the operative words of the new law are expenses "directly related to conduct of gambling." These words express a primary thrust of the regulatory scheme: maintaining the integrity of gambling by segregating it from other business conducted by the gambling establishment. The definition ensures compliance with the rule that the general expenses and revenues of an organization are not commingled with its gambling expenses. *See* Minn.R. 7861.0120 (1993) (separate accounts required for general and gambling revenues). While the statutory language requires a direct link between the expense and the conduct of gambling, it does not create any precise classifications of permissible expenses, and does not necessarily exclude expenses stemming from a gambling employee's "inappropriate" or "illegal" conduct. The Board's allowance of the expense of a bond for a gambling manager, similarly, relates directly to gambling without excluding coverage for a manager's inappropriate acts. Here, the payment of the settlement is linked solely to the gambling establishment's responsibility for the conduct of its gambling employees. The employees were essential to the conduct of lawful gambling at the Legion and conducted no other business there. Absent these employees, the conduct of lawful gambling could not be carried out. Consequently, it is an expense directly related to the conduct of gambling.

5. The Board stated in its reply brief that the new definition did not change existing Board construction of the definition of allowable expenses. At oral argument, counsel for the Board stated

 The gambling expense must also qualify as the "purchase of [a] good, service or other item." We think this new language is broad, and should be given a common sense interpretation. There is no basis for applying it in a hypertechnical manner, particularly when the Board indicates that payment for rent, wages, utilities, liability insurance and workers' compensation presently qualify as "purchases," and that settlement of a workers' compensation claim in lieu of insurance would also qualify.[5] There is no dispute that had a gambling employee incurred a physical injury while working in the gambling operation, the Legion's liability would be an allowable expense. Because payment of this sexual harassment claim is indistinguishable from payment of liability or workers' compensation claims, the total payment of the sexual harassment claim also falls within the new definition.

### DECISION

The district court correctly concluded that a gambling establishment's settlement of a sexual harassment lawsuit is an allowable expense payable out of the gambling profits.

**Affirmed.**

that payment of a workers' compensation claim where no insurance was available would be an allowable expense.